[Cite as *LBC Ltd. Partnership v. Stegaman*, 2017-Ohio-2705.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## VAN WERT COUNTY

**LBC LIMITED PARTNERSHIP,**
**R. SCOTT LAING, PRINCIPAL,**

     **PLAINTIFF-APPELLANT,**         **CASE NO. 15-16-01**

     **v.**

**GARY STEGAMAN,**         **O P I N I O N**

     **DEFENDANT-APPELLEE.**

**Appeal from Van Wert Municipal Court**
**Trial Court No. CVG 1300607**

**Judgment Affirmed**

**Date of Decision:   May 8, 2017**

**APPEARANCES:**

    *Jason N. Flower* **for Appellant**

Case No. 15-16-01

**PRESTON, P.J.**

{¶1} Plaintiff-appellant LBC Limited Partnership ("LBC") appeals the May 11, 2016 judgment entry of the Van Wert Municipal Court finding that LBC breached the implied warranty of habitability and awarding each party $450.00. (Doc. No. 16). For the reasons that follow, we affirm.

{¶2} According to the testimony of Scott Laing ("Laing"), this case stems from an oral rental agreement entered into in April of 2013 concerning 209 Westfield Drive in Middle Point, Ohio. (March 26, 2014 Tr. at 15-19). Laing testified that, under that agreement, tenant Gary Stegaman ("Stegaman"), was to pay LBC $650.00 monthly, plus a $100.00 late fee in the event he failed to tender the rent timely. (*Id.* at 15). Rent was to be paid monthly. (*Id.* at 17); (*Id.* at 19).

{¶3} On October 13, 2013, LBC filed a complaint in which it alleged three claims. In Count One, LBC sought the eviction of Stegaman. (Doc. No. 1).[1] In Count Two, LBC sought rent unpaid for July, August, and September of 2013, all future unpaid rents, as well as any fees and damages to the property that may be discovered subsequently. (*Id.*). In Count Three, LBC seems to seek funds which were collected by Stegaman on LBC's behalf but which Stegaman never paid to

---

[1] We note that LBC's complaint references a residential lease agreement entered into on January 1, 2008. (Doc. No. 1). We also note that Laing's testimony seems to suggest that the written agreement is not the basis of his suit. (March 26, 2014 Tr. at 15-19).

-2-

LBC. (*Id.*). The complaint requested damages in excess of $1,350.00 and any other relief the court deemed appropriate. (*Id.*).

{¶4} Stegaman filed an answer on November 15, 2013 in which he claimed that the relief LBC requested was not appropriate because LBC still owed him money. (Doc. No. 3). That same day, Stegaman filed a counterclaim against Laing for $16,035.22 for the cost of windows, doors, having a lease agreement drawn up, money owed for past services rendered, a water heater, landscaping rocks, and punitive damages. (*Id.*). On December 17, 2013, LBC filed an answer to the counterclaim in which it denied the allegations that formed the basis of Stegaman's counterclaim and asserted that Stegaman failed to state a cause of action on which relief could be granted. (Doc. No. 8).

{¶5} Count One of LBC's complaint was resolved by agreement of the parties. (Nov. 13, 2013 Tr. at 26-28). The trial court heard Counts Two and Three of LBC's complaint, as well as Stegaman's counterclaim, at a hearing on March 26, 2014. (March 26, 2014 Tr. at 5). The trial court issued its judgment entry on May 11, 2016. (Doc. No. 16). The trial court found for LBC as to Count Two for clean-up costs in the amount of $450.00, and the trial court found for Stegaman as to the damages related to the installation of windows at his property in the amount of $450.00. (Doc. No. 16). LBC filed its notice of appeal on June 10, 2016. LBC brings three assignments of error for our review. For ease of discussion, we will

address the second and third assignments of error together, followed by the first

assignment of error.

## Assignment of Error No. II

**The trial court erred in determining that Plaintiff was only entitled to four hundred and fifty dollars ($450.00) for total damages to the rental property when his costs to restore the property exceeded the awarded damages and Defendant failed to maintain the property throughout the tenure of his lease agreement for said property.**

## Assignment of Error No. III

**The trial court erred in determining that Plaintiff was not entitled to any amount of delinquent rent from Defendant, as Defendant had not paid rent for the months of September through December 2013, despite still having his personal belongings on the property and expressly stating that he needed three more weeks to vacate.**

{¶6} In its second assignment of error, LBC argues that the trial court erred

in awarding it only $450.00 for damages to the rental property when the cost to

restore the property exceeded that figure and Stegaman failed to maintain the

property during his tenancy. (Appellant's Brief at 16). Specifically, LBC argues

that the property where Stegaman lived required extensive rehabilitation after his

departure, including trash removal and dumping at a cost of $195.00, $290.00 to

purchase and install a new water heater and the attendant plumbing, $55.00 to repair

a drain, $40.57 to replace a kitchen sink, and numerous other expenses far exceeding

Case No. 15-16-01

the damage award.  (Appellant's Brief at 16-17).  LBC argues that it should have been awarded its actual damages.  (*Id.* at 17).

{¶7} In its third assignment of error, LBC argues that the trial court erred in determining that LBC was not entitled to delinquent rent from Stegaman. Specifically, LBC argues that Stegaman paid no rent for the months of September through December of 2013 despite having his belongings on the property, thus preventing LBC from renting the property to other would-be tenants.  (*Id.* at 18). Thus, LBC argues that it is entitled to rent for the period between September and December of 2013.  (*Id.*).

{¶8} We review damage calculations on an abuse-of-discretion standard. *Roberts v. United States Fid. & Guar. Co.*, 75 Ohio St.3d 630, 634 (1996).  The term "abuse of discretion" refers to a decision that is "arbitrary, unreasonable, or unconscionable."  *Sandusky Properties v. Aveni*, 15 Ohio St.3d 273, 275 (1984), citing *Dayton ex rel. Scandrick v. McGee*, 67 Ohio St.2d 356, 359 (1981) and *State v. Adams*, 62 Ohio St.2d 151,157 (1980).  An abuse of discretion results "only when no reasonable man could take the view adopted by the trial court."  *Pembaur v. Leis*, 1 Ohio St.3d 89, 92 (1982).[2]

---

[2] Stegaman argues that the appropriate standard of review in this case is a manifest weight of the evidence standard.  (Appellant's Brief at 11).  We find that this is in error for the reasons we have explained; however, if Stegaman is correct, we hold that the outcome under his proposed standard of review is the same as it is under the one we have applied.

{¶9} The record reflects Stegaman's testimony that he had an agreement with Laing according to which Stegaman would receive credit toward his own rent if he did work on LBC's behalf and kept an accounting of the work he did. (March 26, 2014 Tr. at 25). Stegaman testified that, under that agreement, he was to find tenants for Laing's various properties and, if he did, he would receive a credit against his own rent equal to one month worth of rent for the tenants he had located. (*Id.* at 26). Stegaman testified that, for the months in which LBC claims he did not pay rent, he did work for LBC for which he was entitled to credit, and he further testified that he spent his own money on certain items for which he should also receive credit. (*Id.* at 27).

{¶10} The record also reflects the testimony of Laing that Stegaman either lost or took two garage door openers and removed a water heater. (*Id.* at 28). Laing further testified that Stegaman's former residence was full of garbage when he departed and that the carpet was in such poor condition that it was not clear whether the carpet could be saved. (*Id.*). According to Laing, all of this had to be fixed at LBC's expense. (*Id.*).

{¶11} The next person to testify was Jim Fiegel ("Fiegel"), who was Laing's real estate manager and was familiar with Stegaman's tenancy at 209 Westfield Drive. (March 26, 2014 Tr. at 29-30). Fiegel testified that he entered Stegaman's property in December of 2013 and removed two loads of trash and that another still

needed to be removed. (*Id.* at 30). Fiegel also testified that the carpet was so dirty that it required several cleanings to make the premise habitable. (*Id.* at 30). Fiegel next testified that the labor cost associated with gathering and then dumping the trash amounted to $232.00, and he claimed that a new water heater cost $215.00 plus tax. (*Id.* at 32). Fiegel asserted that he spent seven hours installing the water heater and repairing the pipes that had been damaged around the water heater. (*Id.* at 33). The rate for Fiegel's labor was $10.00 per hour, plus $25.00 for each of five trips he had to make to the residence, and Fiegel further testified that he spent $27.20 on a mailbox for the residence. (*Id.* at 34). Fiegel testified that he spent one hour installing the mailbox, and he claimed that he had to replace a faucet at a cost of $40.57. (*Id.* at 35). He further testified that the electric company transferred bills in the amount of $404.41, which he said accounted for only December of 2013. (*Id.* at 35-36). Fiegel further testified that other damages included a water bill in the amount of $87.36, and he estimated that the total cost of everything he did was between $1,100.00 and $1,300.00. (*Id.* at 36-39).

{¶12} On cross-examination, Fiegel testified that the electric company, when contacted about the electric bill, indicated that the balance mentioned before was from a previous tenant. (*Id.* at 39).

{¶13} Stegaman next testified again about the issue of back rent and damages. (*Id.* at 41-42). Stegaman's first exhibit is an accounting from May of

2013 indicating the money received and payed out that month. (Defendant's Ex. 1). Stegaman explained that, though this exhibit mentions a $650.00 house payment, he had not actually paid Laing those funds in May of 2013, but that he was credited that amount toward his rent that month. (March 26, 2014 Tr. at 43-45). Stegaman's second exhibit is an accounting from June of 2013. (*Id.* at 45-46). Stegaman further testified that he received a $30.00 credit against his own rent every time he received a rent payment on Laing's behalf, and Stegaman said that he had, during June of 2013, mowed the grass at one of Laing's properties in Ohio City on two occasions, charging a total of $80.00 for that work. (*Id.* at 46-47). The exhibit reflects those items. (Defendant's Ex. 2). Also elaborating on his second exhibit, Stegaman testified that he spent $500.00 to raze a trailer on one of Laing's properties in order to make the property rentable. (March 26, 2014 Tr. at 47). Stegaman also claimed that he paid a lawyer $2,500.00, part of which was compensation for putting together a contract, while the remainder was for past legal bills. (*Id.* at 50-51). Stegaman's second exhibit reflects those items as well. (Defendant's Ex. 2).

{¶14} LBC's next witness was Will Gamble ("Gamble"), who helped Laing to find tenants for some of his properties. (March 26, 2014 Tr. at 53). When questioned by Laing, Gamble testified that Stegaman made tenants at 218 South Potter Street leave the property and that, once they left, Gamble entered and found the property so full of trash that it was not rentable. (*Id.* at 53-54). Gamble further

-8-

testified that there was an agreement according to which Stegaman was to clean a property on Sycamore Street in Convoy, Ohio, but he never did so. (*Id.* at 54-55).

{¶15} On cross-examination, Gamble testified that he once told Stegaman that Gamble knew a third party who wanted to clean the property.[3] Gamble further testified that he was once Laing's property manager, and he said that most of Laing's properties were likely not in rentable condition; Gamble testified that it was possible Laing tried to rent out many of his properties in a state of disrepair. (*Id.* at 57).

{¶16} Stegaman next testified again. (*Id.* at 58). He identified his third exhibit as an accounting for July of 2013. (*Id.* at 58). Stegaman claimed a credit of $600.00 for July of 2013. (*Id.* at 59). Stegaman also testified that there was a $242.00 credit that carried over from July to August of 2013. (*Id.* at 59). Stegaman asserted that he mailed his third exhibit to Laing, who did not dispute it. (*Id.* at 59-60). Stegaman next identified his fourth exhibit as the accounting for August of 2013. (*Id.* at 60). Stegaman claimed a $726.00 carry-over from August to September. (Defendant's Ex. 4). Stegaman testified that he mailed that accounting to Laing, who did not dispute it. (March 26, 2014 Tr. at 61). He went on to testify

---

[3] Gamble did not specifically state which property is being referred to, nor did Stegaman. (March 26, 2014 Tr. at 56). We presume the property in question is the one on South Potter street that was previously mentioned.

that he never received any garage door openers for his property, and he claimed that the carpet was in poor condition when he moved into his property. (*Id.* at 62).

{¶17} Stegaman also testified that the water heater in his residence stopped working in January or February of 2013, at which time Laing authorized Stegaman to purchase a new one and deduct its cost from Stegaman's rent. (*Id.* at 63-64). Stegaman testified that he purchased a water heater from Wallace Plumbing and that the total cost of buying, delivering, and installing the water heater was $760.00. (*Id.* at 64-65). Stegaman further averred that he completed his move out of his residence on Westfield Drive in December 2013 and that he had the electricity and water service there transferred to his new residence in September of 2013. (*Id.* at 65-68).

{¶18} Laing then testified again. (*Id.* at 70). Laing testified that his agreement with Stegaman was that Stegaman was to be paid $10.00 per hour for any labor he did, plus one month's rent in the event Stegaman induced a tenant to sign an annual lease. (*Id.* at 72). Laing said that, in the course of e-mail exchanges, he objected strenuously to many of Stegaman's charges. (*Id.* at 73). Laing went on to say that Stegaman collected $650.00 per month from tenants and, instead of giving those funds to Laing, kept the money for himself, claiming that it was owed to him for his work as Laing's agent. (*Id.* 73). Laing further testified that Stegaman agreed to pay either $2,000.00 or $2,500.00 to handle electrical work at Laing's Ohio City property without having been given authority to spend such funds. (*Id.*

at 73-74). Laing asserted that he paid $600.00 toward the work, but then became concerned because Stegaman had no information about governmental permits that he might need; Laing said he went to the property and saw no indication that any work had been done. (*Id.* at 74).

{¶19} Laing averred that he had deep reservations about many of the charges indicated in Stegaman's accountings. Specifically, Laing said that Stegaman once tried to charge him for twelve hours of work mowing a one-acre lot and that Stegaman purchased a lawn mower for $200.00 and tried to claim all of the purchase price as a credit against his rent. (*Id.* at 74-75). Laing testified that, when he objected to Stegaman's accountings, Stegaman stopped paying him and that Laing received no cash from Stegaman after May or June of 2013. (*Id.* at 75-76). Laing claimed he knew nothing about many of the charges in Stegaman's first exhibit. (*Id.* at 75).

{¶20} Laing further asserted that Stegaman damaged him by failing to clean certain properties after tenants left them. (*Id.* at 77-78). Laing claimed that the most dramatic way in which Stegaman damaged him was by his failure to return Laing's Ohio City property to rentable condition, thus leaving it empty for three years. (*Id.* at 79).

{¶21} The next person to testify on Laing's behalf was Jennifer Thomas ("Thomas"). (*Id.* at 87). On direct examination, Thomas testified that she rented a

property in Van Wert beginning in March or April of 2013. (*Id.* at 88). Thomas testified that, during the first few months of her tenure in the Van Wert property, she contacted Stegaman about fixing a cupboard door with a crack in it. (*Id.* at 90). She said Stegaman took the door for three months and returned it having simply glued it back together. (*Id.*). Thomas further testified that she contacted Stegaman about a plumbing issue at her residence to no avail, and she said she had to call Laing to fix the issue. (*Id.* at 91).

{¶22} On cross examination, Thomas said that, when she first encountered an electrical problem, there was a person at her home to address the problem within two weeks, and she said that someone came to look at a plumbing issue within one week. (*Id.* at 93-94).

{¶23} Next, Stegaman testified again. (*Id.* at 96). Stegaman testified that his understanding of his relationship with Laing was that Stegaman was to handle maintenance on Laing's four rental properties and ensure that rent was sent to Laing via Center State Bank. (*Id.* at 97). Stegaman said he gave receipts to those renters who paid him in cash, but he also said that he no longer had copies of the receipts. (*Id.* 98-99).

{¶24} On cross examination, Stegaman testified that Laing approved the purchase of the before-mentioned lawn mower and could retrieve it any time he wished. (*Id.* at 116). He further testified, in explaining one of his charges to Laing,

that it took twenty hours to mow a one-acre lot at the Ohio City property because, when he mowed it for the first time, the weeds were nearly as high as one's waist. (*Id.* at 116). Stegaman then admitted that he actually did not spend twenty hours mowing on the property, but he claimed that the city would have charged Laing $250.00 to mow the property had it done so. (*Id.*). Stegaman further maintained that he had spoken to Laing about the size of the bill Stegaman submitted, and he claimed that Laing agreed to pay that bill. (*Id.* at 117). As to the cabinet door mentioned above, Stegaman testified that he intended to obtain a cabinet door from someone at a cost of $100.00; he then admitted that Laing was entitled to a $100.00 credit. (*Id.* at 117). Stegaman also testified that $500.00 was necessary to raze a trailer because the trailer had sunk into the ground, and he further asserted that Laing approved the expenditure. (*Id.* at 117). Stegaman also said he had a bill indicating that the cost of razing the trailer was $500.00, but he could not locate the bill. (*Id.* at 118). Stegaman testified that he charged Laing for ten hours of work for calling plumbers and other professionals, and Laing himself, as well as for time spent reading Laing's multiple e-mails, which Stegaman said he often had to read multiple times to comprehend. (*Id.* at 120). Stegaman further testified that he charged Laing for all of his time because Laing frequently called him at work and even asked him to leave work to tend to his properties. (*Id.* at 120-121). Stegaman insisted that he was not behind in rent. (*Id.* at 121).

-13-

**{¶25}** The trial court next moved to the subject of Stegaman's counterclaim. (*Id.* at 131). Stegaman orally agreed to amend his claimed damages so that they comported with the trial court's jurisdictional limit of $15,000.00. (*Id.* at 131). Stegaman testified that Laing owed him $1,500.00 for windows he installed, $600.00 for doors, $1,700.00 as reimbursement for legal expenses, $726.22 for services rendered to Laing, as well as $900.00 for landscaping items. (*Id.* at 132). Stegaman admitted that he had no receipt for the windows he purchased. (*Id.* at 132). He testified that five windows came at a cost of $1,500.00. (*Id.* at 134). Stegaman averred that he paid for the windows based on the assurance that Laing would extend the land purchase contract, and he further asserted that Laing consented to the installation of the windows. (*Id.* at 135). Stegaman further claimed that he bought doors for both the front and back of his home. (*Id.* at 135-136). He claimed that Laing was aware of the purchase of the doors and consented to it, though Stegaman also claimed he received no credit against his rent for the purchase of the doors or the windows. (*Id.* at 138).

**{¶26}** As to the damages claimed for legal expenses, Stegaman testified that he had to pay Laing and an attorney a total of $1,700.00 to have a lease drawn up. (*Id.* at 138). He further testified that he actually paid $1,500.00 to Laing and an additional $1,000.00 to the attorney. (*Id.* at 139). In discussing the $726.22 Stegaman sought from Laing, Stegaman testified that said amount was owed to him

in August 2013 and included carry-over balances from prior months of work. (*Id.* at 144). Stegaman further testified that he sought $900.00 from LBC for landscaping rocks that he had to install in May of 2008 because the outside of his property was an eyesore, necessitating the installation of two four-by-four skids of the rocks in question. (*Id.* at 144-145). Stegaman's seventeenth exhibit is a receipt for the landscaping rocks. (*Id.* at 145-146); (Defendant's Ex. 17).

**{¶27}** The next person to testify was Stegaman's witness Angela Fiedler ("Fiedler"). (*Id.* at 153). She testified that the carpet in Laing's Westfield Drive property was in poor condition when she first saw it. (*Id.* at 153). She testified that she attempted to clean the carpet "every week" with a shampooer and still could not clean it entirely. (*Id.* at 154).

**{¶28}** Laing then testified again, this time as to the allegations in Stegaman's counterclaim. (*Id.* at 158). Laing testified that he never had any conversation with Stegaman about windows, doors, or any improvements to the property and would not have agreed to such improvements in any case because Stegaman did not pay his rent on time. (*Id.* at 158). Laing went on to testify that, had he agreed to such improvements, that agreement would have been in writing. (*Id.* at 159). As to the landscaping rocks, Laing testified that he had visited the Westfield Drive property after the prior hearing in this case and that "it [did not] seem like there [was] anything there." (*Id.* at 161). Laing further testified that he knew nothing about the

doors Stegaman referenced. (*Id.*). Regarding the lease purchase agreement, Laing testified that the $2,500.00 Stegaman paid included funds that would resolve various legal claims that arose because Stegaman was behind in rent. (*Id.* at 162).

{¶29} On this record, we conclude that the trial court did not abuse its discretion in calculating damages. This case presents a set of facts similar to those in *Roberts*. 75 Ohio St.3d 630. In that case, an insured party sought damages from an insurer stemming from the insurer's alleged failure to defend the insured in a lawsuit. *Id.* at 631. The trial court in that case found that the defendants were entitled to $1.5 million in damages. *Id.* at 634. On appeal, the Supreme Court of Ohio upheld that award, noting that, while the trial court did not specifically articulate its reasoning for awarding a particular damage figure, the trial court "must have found that these additional * * * [damages] were remote, speculative, or not supported by the evidence." *Id.* So too here. As to LBC's second assignment of error, the trial court did not make specific, enumerated findings as to every piece of evidence conceivably relevant to damages to Stegaman's residence and the cost of repairing the same. However, the trial court expressed doubt about the truthfulness of both parties elsewhere in its entry. (*See* Doc. No. 16). We conclude, as did the Ohio Supreme Court in *Roberts*, that the trial court must have found certain damages claimed by LBC to lack credibility. The same is true of the third assignment of error. That is, the trial court did not make specific findings as to the credibility of

every piece of testimony or evidence as to how many months of rent Stegaman paid, how much credit he was entitled to because of his labor or his own expenditures, or the like. We conclude here as before that the trial court used its discretion to determine certain evidence on which the plaintiff relies as to back rent not to be credible.

{¶30} For the foregoing reasons, LBC's second and third assignments of error are overruled.

### Assignment of Error No. I

**The trial court erred in determining that Plaintiff had breached the warranty of habitability and therefore was not entitled to damages for Defendant's removal of a fixture, as Plaintiff and Defendant agreed that Defendant would be credited for the cost of such fixture.**

{¶31} In its first assignment of error, LBC argues that the court erred in concluding that LBC had breached the implied warranty of habitability and was not entitled to damages for Stegaman's removal of a fixture—a water heater—as LBC and Stegaman had agreed that Stegaman would be credited for the cost of the water heater. (Appellant's Brief at 13). Specifically, LBC claims that the trial court failed to acknowledge the fact that the parties came to an agreement as to the water heater—both parties understood that Stegaman, having bought the water heater, would be given credit for the purchase toward his rent. (Appellant's Brief at 13).

**{¶32}** R.C. 5321.04 sets forth the warranty of habitability, and it specifically requires landlords to supply "reasonable amounts of hot water." R.C. 5321.04(A)(6). Case law has explained that demonstrating a breach of that provision requires one to demonstrate that the landlord received notice of the defective condition of the rental premises, that the landlord knew of the defect, or that the tenant made reasonable but unsuccessful efforts to notify the landlord. *Eberly v. Irons*, 5th Dist. Tuscarawas No. 2006 AP 01 0004, 2007-Ohio-4240, ¶ 52. We review questions of law de novo. *Nationwide Mutual Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108 (1995).

**{¶33}** The record reflects that the water heater in Stegaman's residence ceased to function in January or February of 2013. (March 26, 2014 Tr. at 63). Thus, at that time Laing supplied no hot water at all to Stegaman's residence. Laing testified that, when Stegaman informed him that the water heater had stopped working, Stegaman was behind in his rent. (*Id.* at 85). Laing testified that he told Stegaman that Stegaman needed to address those arrearages before Laing would make improvements to the property. (*Id.* at 85-86).

**{¶34}** On these facts, we conclude that the trial court did not err in finding a breach of the implied warranty of habitability. *Crawford v. Wolfe*, 4th Dist. Scioto No. 01CA2811, 2002-Ohio-6163 (finding a breach of R.C. 5321.04 when the landlord knew of certain defects of the kind contemplated by the statute and failed

to repair them). The record is clear that Laing was made aware that Stegaman had no hot water in his residence, and Laing refused to remedy the problem. (March 26, 2014 Tr. at 85-86).

{¶35} LBC's first assignment of error also raises an issue as to damage calculation, which we review on the abuse-of-discretion standard explained above.

{¶36} The trial court heard extensive testimony and reviewed copious exhibits as to damages, and the trial court's discussion of the water heater is essentially that Stegaman purchased it in reliance upon Laing's assurance that a new purchase agreement would be forthcoming. (Doc. No. 16). The trial court further concluded that Laing should not be entitled to damages where Stegaman simply removed an item that Laing breached a duty by failing to provide. (*Id.*).

{¶37} On this record, we conclude that the trial court did not abuse its discretion in calculating damages. That is, a reasonable person could have adopted the view taken by the trial court. The trial court articulated its reasons for its damage award. (Doc. No. 16). Indeed, the trial court in *Roberts* was deemed not to have abused its discretion even though the trial court "did not state its reason" for allowing a particular damage award. *Roberts*, 75 Ohio St.3d at 634. It was enough that the trial court in *Roberts* "must have found" certain evidence as to damages to be remote, speculative, or otherwise not supported by the evidence. *Id.* If the

unexplained conclusion of the trial court was not an abuse of discretion in *Roberts*, the logic offered by the trial court in this case is certainly not so either.

**{¶38}** For the foregoing reasons, LBC's first assignment of error is overruled.

**{¶39}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**WILLAMOWSKI and ZIMMERMAN, J.J, concur.**